*826 Opinión disidente emitida por la
Jueza Asociada Señora Pabón Charneco,
a la cual se une el Juez Asociado Señor Feliberti Cintrón.
Escribo este disenso con un sentido de gran conster-nación. Escudándose con un derrame de tinta a través de setenta (70) páginas, una mayoría de este Tribunal intenta asfixiar un despilfarro millonario de fondos públicos. En el camino, hoy el Tribunal convierte la "discreción” en un acto arbitrario y la “deferencia judicial” en un ejercicio de sumi-sión miope. Irónicamente, el principio de sana administra-ción que con vehemencia particular ha sido aplicado por este Tribunal a las otras ramas del gobierno, se convierte hoy en un actor destituido, silente y, en fin, ausente de la administración de la Rama Judicial. Se trata verdadera-mente de la institucionalización de una “segunda vara” para medir los actos de administración en la Rama Judicial.
Mi conciencia me impide avalar un procedimiento de contratación en el cual esta Rama terminará pagando una cantidad millonaria de dinero en exceso, en comparación con otras alternativas. Hace escasamente unas semanas este Tribunal expresó que “la dama de la justicia es ciega, no ingenua”. (Enfasis suprimido). P.I.P. v. E.L.A. et al., 186 D.P.R. 1, 14 (2012). Con la decisión a la que se llega hoy, la ingenuidad encuentra un hueco por el cual inmiscuirse si-gilosamente en al ámbito de la administración de la Justicia. Ello a cuentas de la credibilidad de nuestra Rama Judicial. Ante este escenario dantesco, el disenso es un im-perativo moral.
1
La idea de construir un Centro Judicial nuevo en Aibo-nito surgió a raíz de un informe relacionado a la Reforma *827 Judicial de 2003.(1) La razón para ello fue que el Centro Judicial existente tiene limitaciones de crecimiento.(2) A tales fines, en el Plan Estratégico 2007-2011, se proyectó la construcción de las instalaciones nuevas del Centro Judicial de Aibonito. La Oficina de la Administración de los Tribunales (en adelante OAT) llevó a cabo un proceso in-terno desde jimio de 2008, dirigido a identificar las carac-terísticas que debía tener este Centro Judicial. El 28 de julio de 2009, la OAT publicó una solicitud de propuestas (Request for Proposal, en adelante RFP) para diseñar, construir, financiar y arrendar las instalaciones nuevas del Centro Judicial de Aibonito.
En el RFP se detallaron los requisitos de la propuesta como, por ejemplo, especificaciones de diseño, seguridad, materiales de construcción, entre otros. Asimismo, la OAT publicó los criterios de evaluación que utilizaría el Comité Evaluador para analizar cada propuesta. Estos criterios son: la ubicación o localización del terreno; la amplitud o el tamaño del terreno; la calidad y funcionalidad en el diseño y la construcción; el uso de materiales de primera calidad; la capacidad de estacionamiento para funcionarios y pú-blico; el tiempo de construcción; el monto del canon de arrendamiento por pies cuadrados; el historial de cumpli-miento del desarrollador en otros proyectos similares rea-lizados; la estructura administrativa y recursos del pro-grama de mantenimiento, y, por último, la certificación del edificio como Green Building.
La OAT, en un principio, se limitó a indicar que el orden de los criterios esbozados no debía entenderse necesaria-mente como el orden de prioridad. Ello se debió a que la decisión de cuál criterio tendría prioridad sobre el otro iba a ser tomada luego de sometidas las propuestas. No obs-tante, posteriormente, y luego de sometidas las propues- *828 tas, el Comité Evaluador asignó un valor de diez por ciento (10%) a cada uno de los diez criterios a evaluar. Esto es sin orden de preferencia alguno.
El Comité Evaluador estuvo compuesto por los funcio-narios siguientes: Ing. José F. Moreno Navarro, adminis-trador de la División de Locales y Servicios Especiales de la OAT, como su presidente; Hon. Rafael E. Taboas Dávila, juez administrador regional, Centro Judicial de Aibonito; Hon. Ángel Colón Pérez, ayudante especial del Juez Presi-dente; Sr. William Pando Reyes, director de Administra-ción de OAT; Leda. Gina Méndez Miró, entonces directora de Programas Judiciales; Ledo. Miguel Ferrer Rivera, director de Operaciones de la OAT; Sra. Maritza Castillo Trilla, directora de la Oficina de Planificación, Presupuesto y Recursos Externos de la OAT. Además, el Comité contó con el Ing. Ángel Herrera Blanco, como asesor externo. Cons-tituido el Comité, la evaluación preliminar de cada pro-puesta ftte delegada a su Presidente, ingeniero Moreno Navarro, junto al asesor externo, ingeniero Herrera Blanco. Como bien se expone en la sentencia de este Tribunal, el 23 de diciembre de 2010 la OAT notificó un orden de preferen-cia en la negociación del proyecto.(3) En efecto, en esta no-tificación se dio a conocer que STZ obtuvo mejor evaluación que el resto de los proponentes y, por consiguiente, sería el primero en turno para negociar con la OAT el desarrollo del proyecto.
Inconformes, Maranello y Bird, y con argumentos simi-lares a los que argumentan ante este Tribunal —detalla-dos en la sentencia que antecede— instaron sus respecti-vos recursos de revisión ante el Tribunal de Apelaciones. El tribunal a quo resolvió que el proponente STZ obtuvo ochenta y dos (82) puntos; seguido por Maranello con se-
*829 tenta y seis (76) puntos, y Bird, en tercer lugar con setenta y cinco (75) puntos.(4)
Inconformes con el resultado, Maranello y Bird presen-taron sus respectivos recursos de certiorari ante nos.
II
Aunque en Puerto Rico no existe legislación que regule el procedimiento de la adquisición de bienes y servicios para entidades gubernamentales, hemos reiterado que es-tos procedimientos “están revestidos de un gran interés público y aspiran a promover una sana administración pública”. Caribbean Communications v. Pol. de P.R., 176 D.P.R. 978, 994 (2009). Véanse, en general: Costa Azul v. Comisión, 170 D.P.R. 847 (2007); A.E.E. v. Maxon, 163 D.P.R. 434 (2004). Según hemos explicado, este mecanismo busca, en esencia,
... proteger los intereses del pueblo, procurando conseguir los precios más económicos; evitar el favoritismo, la corrupción, el dispendio, la prevaricación, la extravagancia y el descuido al otorgarse los contratos, y minimizar los riesgos de incumpli-miento. (Enfasis suplido). Caribbean Communications v. Pol. de P.R., supra, pág. 994. Véase Empresas Toledo v. Junta de Subastas, 168 D.P.R. 771, 778 (2006).
La subasta formal y la compra negociada(5) son catalo-gadas como los métodos principales de adquisición guber- *830 namental de bienes y servicios. 1B McBride, Thouhey and Wilson, Government Contracts: Cyclopedic Guide to Law, Administration, Procedure 9 — 5 (2012). De una parte, la compra negociada se caracteriza por ser un procedimiento mucho más informal y flexible; es ideal para adquisiciones de bienes y servicios “especializados que involucran asun-tos técnicos o muy complejos o cuando existen pocos com-petidores cualificados”. Caribbean Communications v. Pol. de P.R., supra, pág. 996; R & B Power v. E.L.A., 170 D.P.R. 606, 621-622 (2007).
Según el Reglamento de Subastas Formales de Bienes y Servicios de la Rama Judicial, la compra negociada es un procedimiento excepcional. Es decir, reconoce que la com-pra negociada no es un método de compra ordinario; por el contrario, el Reglamento dispone que debe ser utilizado cuando, por ejemplo, “la adquisición de bienes o servicios ... sean sofisticados, especializados o complejos”.(6) Art. XXIV (A)(1) del Reglamento de Subastas Formales de Bie-nes y Servicios de la Rama Judicial.
Generalmente, se prefiere la metodología de una com-pra negociada para la adquisición de bienes y servicios téc-nicos, porque la agencia puede utilizar la flexibilidad y dis-creción de este proceso para considerar una diversidad de factores que pueden llegar a ser, incluso, más importantes *831 que el precio.(7) Sin embargo, desde R & B Power v. E.L.A., supra, advertimos que
... [e]sa flexibilidad ... no puede convertirse en patente de corso para el dispendio de fondos públicos. ... Como siempre, será responsabilidad de los tribunales velar por que las agen-cias y las corporaciones públicas no se conviertan en autócra-tas en el ejercicio de la facultad extraordinaria concedida, ac-tuando sin parámetros adecuados y exentos de supervisión alguna. íd., pág. 625.
Desde entonces observamos que la compra negociada otorga a los organismos gubernamentales una discreción tan abarcadora que debía ser regulada para proteger el interés público, asegurar un debido proceso de ley y salva-guardar principios inherentes a los procesos de adquisicio-nes como lo es la sana administración, la adquisición eco-nómica de bienes y servicios y la libre competencia.
Es por ello que cada entidad gubernamental debe limi-tar su poder delegado de adquisición de bienes y servicios para llevar a cabo procesos de compra que se ajusten al principio de libre competencia, igualdad de condiciones en-tre los suplidores y transparencia en la contratación y ero-gación de fondos públicos. McBride, Thouhey and Wilson, supra, pág. 9-9. Véase, en general, Asoc. Fcias. Com. v. Depto. de Salud, 156 D.P.R. 105 (2002). Más importante aún, las adquisiciones de bienes y servicios que realiza el gobierno mediante RFP están —como cualquier otra su-basta gubernamental— revestidas de un gran interés público. Esta doctrina pretende proteger al erario y garan-tiza que las adquisiciones se lleven a cabo con transparen-cia, eficiencia y probidad. Caribbean Communications v. Pol. de P.R., supra.
*832 Al igual que una subasta formal, la compra negociada tiene sus retos y particularidades que deben ser atendidas para ajustarse a los principios señalados. Una de las pecu-liaridades consiste en que la solicitud de propuesta —RFP— debe contener como mínimo: (1) los requisitos y las especificaciones necesarias para satisfacer las necesi-dades de la agencia; (2) anticipar de forma general los tér-minos y las condiciones del contrato; (3) información reque-rida en la propuesta, y (4) factores y subfactores significativos o importantes junto a su prioridad o impor-tancia relativa. C. Tiefer y W.A. Shook, Government Contract Law in the Twenty-First Century, N.C., Carolina Academic Press, 2012, pág. 80; Feldman, op. cit., pág. 181. Las agencias tienen una discreción amplia al diseñar los crite-rios que utilizarán para la evaluación, siempre que estén razonablemente relacionados con las necesidades de la agencia y que no sean contrarios a las leyes o los reglamen-tos aplicables. Véase McBride, Thouhey and Wilson, supra, Vol. 1B, pág. 9-13.
No obstante, aun cuando la solicitud de propuesta iden-tifique los criterios de evaluación, la entidad está obligada a publicar en su solicitud de propuestas los criterios de evaluación y su prioridad o importancia relativa. S.W. Feldman, Government Contract Guidebook, 4ta ed., West, 2011, pág. 182.(8) Este Tribunal planteó este requisito desde R & B Power v. E.L.A., supra. Específicamente, adoptamos el señalamiento siguiente de los tratadistas McBride y Touhay:
In addition to the specification, a solicitation for competitive proposals, must include, at a minimum, a statement of all significant factors and subfactors the government reasonably expects to consider, the relative importance assigned to each of these factors and subfactors, a statement indicating whether the proposals will be evaluated and awarded with discussions *833 with offerors or without discussions with offerors, and the time and place for submission of proposal. (Enfasis suplido). R & B Power v. E.L.A., supra, pág. 622 esc. 5, citando 1B Government Contracts: Cyclopedic Guide to Law, Administration, Procedure Sec. 9.20 [3], pág. 9-10 (Sup. 2007).
Sin embargo, ello no se limitó a una nota al calce, sino que recientemente reiteramos esta norma. Así, en Caribbean Communications v. Pol. de P.R., supra, pág. 996, re-solvimos que
[l]os requisitos a considerar en la adjudicación del contrato se enumeran en el RFP, el cual incluye, entre otros, el valor que se le asigne a éstos, el itinerario para recibir y evaluar las propuestas^ y adjudicar la buena pro, así como los términos del contrato. (Enfasis suplido).
Esta regla pretende que la agencia fije de antemano las normas que regirán el proceso de evaluación de propuestas. McBride, Thouhey, Wilson, op. cit., Vol. 1B, pág. 9-34; citando Spectron, Inc., B-172261, 51 Comp. Gen. 153 (1971). Asimismo, tiene el propósito de evitar dar la impresión de que una agencia haga ajustes “a puerta ce-rrada” en cuanto al peso asignado a cada criterio y así evi-tar un posible esquema de favoritismo. A contrario sensu, si no existiera esta regla, estos esquemas pueden quedar fácilmente disfrazados bajo la etiqueta de “•discreción ad-ministrativa”, lo que, a su vez, haría virtualmente imposi-ble que los proponentes que tengan razones válidas para impugnar el proceso de subasta, no tengan la prueba sufi-ciente para probar el favoritismo que regularmente viene al mundo de forma solapada. “Después de todo, la dama de la justicia es ciega, no ingenua”. (Enfasis en el original). P.I.P. v. E.L.A. et al., supra, pág. 16.
Relacionado a lo anterior, el Auditor General de Estados Unidos ha opinado que cada proponente tiene derecho a saber si la adquisición se otorgará a base de un estándar mínimo de un costo bajo o si el costo es secundario respecto al precio. Esto evita que el proceso de compra negociada se *834 convierta en una apuesta, en lugar de una competencia de propuestas. En este sentido, también ha señalado que es desventajoso para la competencia de propuestas el que los competidores no tengan una idea de los valores relativos de criterios como el precio y la excelencia técnica. (9) Feldman, op. cit., pág. 181.
Así planteado el derecho aplicable, concentraré mi aná-lisis en los tres (3) fundamentos más sobresalientes por los cuales estoy convencida de que la subasta en cuestión está viciada y, por lo tanto, debe ser cancelada por el bien del interés público y en virtud de la sana administración de la Rama Judicial. En primer lugar, el Comité Evaluador ac-tuó arbitrariamente al asignar un peso a los distintos cri-terios de evaluación sin haberlo notificado en el RFP. En segundo lugar, el Comité Evaluador erró al asignar pun-tuaciones sin base o justificación racional en criterios como el de la amplitud del terreno y la posibilidad de expansión. En tercer lugar, evaluaremos unos hallazgos de la Oficina del Contralor, los cuales impiden avalar una subasta como la de autos.
r*H f — { hH
Usualmente este Tribunal revisa las adquisiciones de la Rama Ejecutiva. No obstante, en esta ocasión tenemos la oportunidad de examinar una adquisición de la rama gu-bernamental de la que somos parte: la Rama Judicial.
Primeramente, uno de los proponentes perdidoso alega que la OAT actuó arbitraria y caprichosamente al notificar la asignación de un peso o importancia de diez por ciento (10%) a cada uno de los criterios de evaluación. Además, señala que, como regla general, el criterio principal de las subastas es el precio, pues se busca hacer la obra al precio más bajo posible. Justiniano v. E.L.A., 100 D.P.R. 334, 338
*835 (1971). Por último, argumenta que la práctica de asignar peso a cada criterio de evaluación “al menos debe levantar suspicacia pues con ello se favorece o perjudica a determi-nados licitadores; lo que milita contra la transparencia”.(10)
A contrario sensu, la OAT arguye, alejándose de nues-tros pronunciamientos, que la flexibilidad del procedi-miento de RFP “solo exige que los proponentes conozcan los criterios a base de los cuales la agencia evaluará las propuestas”.(11) El Comité indica que decidió asignar un mismo peso para cada uno de los criterios, luego de anali-zar y evaluar distintas posibilidades y en consideración a la importancia que tienen todos los criterios tales como la ubicación del Centro Judicial de Aibonito, su diseño y la experiencia que se requiere para desarrollarlo y administrarlo.(12) Además, en cuanto al criterio del canon de arrendamiento, señalan que es de suma importancia, pero considerando que tiene que ver con un centro judicial regional y que el edificio pasará a manos de la OAT al final del término de arrendamiento, la calidad y el manteni-miento, entre otros factores, tienen igual importancia.
En este caso, aunque la OAT asignó un peso igual a cada criterio, los hechos indican que esto ocurrió con pos-terioridad a que las propuestas fueran sometidas y evaluadas. Si bien es cierto que una agencia puede razona-blemente determinar el peso o la importancia que le asig-nará a cada criterio de evaluación, esta información debe ser publicada en el RFP. Esto evita que se pueda reclamar sobre la sana administración de la OAT. Además, la notifi-cación del peso o importancia de cada criterio propicia que cada proponente compita en igualdad de condiciones al mo-mento de crear su propuesta de modo que pueda ajustar su propuesta, según la importancia establecida de antemano para cada criterio.
*836 Si bien es cierto que, como señala la mayoría de este Tribunal, “no existe una regla inflexible que exija adjudi-car la subasta al postor mas bajo”,(13) no es menos cierto que asignar porcentajes o pesos a los criterios de evalua-ción tras bastidores, es una práctica indeseable que crea, como mínimo, suspicacia sobre la transparencia del pro-ceso llevado a cabo por la OAT. No importa que fueran pesos iguales, pues cualquier combinación puede ser utili-zada para subir o bajar la importancia de criterios para así favorecer las fortalezas o minimizar las debilidades de una propuesta. Nuevamente, “la dama de la justicia es ciega, no ingenua”. (Enfasis suprimido). P.I.P. v. E.L.A. et al., supra, pág. 14. Además, la falta de notificación en el RFP del peso que se le asignará a cada criterio, peijudicó el interés público y la competencia al no promover que los proponen-tes pudieran darle más o menos importancia a uno o varios de los factores.
En vista del razonamiento que antecede, entendemos que el Comité Evaluador y la OAT actuaron arbitraria y caprichosamente al no asignar y notificar en el RFP el valor o peso de cada criterio. A diferencia de la mayoría de este Tribunal, estoy convencida de que por el bien del inte-rés público y la sana administración de la Rama Judicial, la OAT debió cancelar la solicitud de propuestas; es decir, debió hacer buen uso del Artículo XXII(H) del Reglamento de Subastas Formales de Bienes y Servicios de la Rama Judicial, el cual le reserva el derecho de “cancelar cual-quier subasta emitida, independientemente de la etapa en que se encuentre, siempre que sea antes de formalizar el contrato o haber emitido una orden de compra”.
También, la OAT fue caprichosamente arbitraria al asignar puntuaciones sin base racional alguna. Así, por ejemplo, levanta suspicacia el hecho de que en el criterio de amplitud o tamaño del terreno la OAT otorgó una puntua- *837 ción de diez (10) a Maranello, mientras que otorgó ocho (8) puntos a STZ. Aunque Maranello obtuvo mejor puntua-ción, opinamos que la puntuación otorgada a STZ no en-cuentra lógica ni justificación que sostenga una mera dife-rencia de dos (2) puntos, cuando la propuesta de Maranello ofrece catorce punto cincuenta y seis (14.56) cuerdas de terreno con un espacio de expansión de cinco punto veinti-siete (5.27) cuerdas; mientras que STZ ofrece cuatro punto cero una (4.01) cuerdas con un espacio de expansión de cero (0) cuerdas. Sobre este particular debemos recordar que uno de los factores en el criterio o la amplitud o el tamaño del terreno era la posibilidad de expansión futura. STZ se limitó a explicar que para una futura expansión del Centro Judicial de Aibonito podría construirse un piso adi-cional en el edificio.
En otras palabras, la cabida de la propiedad ofrecida por STZ solamente equivale a un veinte por ciento (20%) de la cabida de la propiedad de Maranello. No obstante, la diferencia en la escala de avalúo es de solamente dos (2) puntos. Aun si descartamos el requisito de espacio adicio-nal para expansión dispuesto en el RFP, un simple cálculo matemático niega la posibilidad de algún razonamiento que sostenga los ocho (8) puntos que la OAT concedió a STZ en el criterio de amplitud de terreno.
Sobre el particular, es importante señalar que Bird ar-guye que el Comité Evaluador fue arbitrario al asignar una puntuación casi perfecta a STZ en el renglón de “am-plitud o tamaño del terreno”. Surge del expediente que el terreno de STZ era uno de los más pequeños. De igual forma, en cuanto a la posibilidad de expansión —subfactor considerado en el criterio de amplitud — , STZ se limitó a señalar que el diseño estructural permitiría la construc-ción de un piso adicional. Sin embargo, obtuvo una puntua-ción casi perfecta —ocho (8) puntos— sin ni si quiera iden-tificar las escaleras o los elevadores que permitirían la expansión futura.
*838 Por otro lado, STZ fue el proponente que mayor canti-dad de puntos obtuvo en el criterio de “calidad y funciona-lidad en el diseño y construcción”. Sin embargo, su pro-puesta contiene el uso de hormigón postensado, el cual fue taxativamente prohibido en el RFP. No obstante, STZ llegó a ser el proponente que mayor puntación obtuvo en ese renglón —nueve (9) puntos.(14)
Estas situaciones se repiten en cada uno de los criterios evaluados por el Comité y con cada uno de los proponentes.
IV
Otra razón de gran peso que me mueve a disentir y que la mayoría de este Tribunal simplemente ignora, es el In-forme de Auditoría del Contralor de Puerto Rico DA-12-52(15) y DA-12-53.(16) Estos informes, revelan que la OAT ha tenido serios señalamientos, especialmente en cuanto a los *839 cánones de arrendamiento del edificio de la OAT, el Tribunal de Apelaciones y la construcción de la Sala de Relaciones de Familia y Menores del Municipio de Bayamón.
Así, por ejemplo, la señora Contralora concluyó que los edificios de la OAT y el TA y sus estacionamientos están alquilados por un canon de arrendamiento muy por encima de lo que se paga en el mercado por espacios de alquiler en edificios similares. A estos efectos, la Oficina del Contralor, mediante un perito cualificado como ingeniero civil y tasa-dor, preparó la tabla comparativa siguiente de cánones de arrendamiento de edificios utilizados como comparables:(17)
Localización Área Rentable Cantidad de estaciona-mientos cedidos por cada 1,000 pies cuadra-dos de AR Renta Básica CAM(18) por pie cuadrado Cargo por cada esta-cionamiento adicional a los incluidos en la renta básica
San Patricio, Guaynabo 207,823 $22.00 $7.97 $80
Calle San Roberto, Río Piedras 73,030 4.1 $21.00 $10.00 Incluidos
Calle Chardón, Hato Rey 209,488 4.5 $19.50 1.42 $85 a$125
*840 Ave. Los Romeros, Motehiedra San Juan 177,880 4.9 $19.00 8.52 $55 a $75
Ave. Ponce de León, Hato Rey 8,368 4.42 $19.00 ¡.00 $60
El informe indica que al considerar la calidad de la cons-trucción y las terminaciones interiores de los edificios de la OAT y del Tribunal de Apelaciones, la renta debería estar en el límite inferior de diecinueve dólares ($19) por pie cuadrado. Peor aún, en cuanto a la renta del estaciona-miento, la Contralora indicó que mensualmente se paga cuatrocientos siete mil ochocientos ocho dólares ($407,808) mientras que el precio del mercado es de una renta men-sual de ochenta y ocho mil quinientos dólares ($88,500). Esta renta cubre el uso de setecientos ocho (708) estacionamientos. Según estos datos, el costo mensual por cada estacionamiento para cada empleado asciende a qui-nientos setenta y seis dólares mensuales ($576); mientras que en los edificios comparables se paga una renta de esta-cionamiento ascendente a ciento veinticinco dólares ($125) mensuales. Según la Contralora, esta contratación le con-lleva al erario un pago de rentas en exceso de cerca de tres millones ochocientos treinta y un mil seiscientos noventa y seis dólares ($3,831,696) anuales.(19)
En fin, según el Informe, la OAT terminará pagando cerca de doscientos dieciocho millones trescientos treinta y dos mil ciento veintisiete dólares ($218,332,127), en exceso del canon de una renta razonable durante el término del Contrato que asciende a treinta (30) años. Consecuente- *841 mente, la Oficina del Contralor advirtió a los administra-dores de la Rama Judicial de los efectos adversos al presu-puesto de la Rama Judicial y al Presupuesto del Gobierno de Puerto Rico. Más aún, advirtió que, como corolario de la sana administración pública, la Directora Administrativa de los Tribunales debió solicitar un estudio o evaluación de rentas prevalecientes en el mercado para edificios comparables.
Señalamientos análogos se encuentran en el Informe de Auditoría DA-12-53 de 19 de marzo de 2012. En esta oca-sión, los señalamientos están relacionados con la construc-ción de la Sala de Relaciones de Familia y Asuntos de Me-nores del municipio de Bayamón. Específicamente, la Oficina del Contralor indicó que en virtud del “Contrato de Diseño, Construcción, Financiamiento y Arrendamiento”, la renta anual de trescientos veinticuatro (324) unidades de estacionamientos asciende a seiscientos cincuenta y cuatro dólares con trece centavos ($654.13) pagaderos mensualmente por cada unidad de estacionamiento(20) Esto representa un total de sesenta y ocho millones no-venta y nueve mil ochocientos setenta y cinco dólares ($68,099,875) pagados en exceso del canon de una renta razonables durante el término de treinta (30) años del Contrato. (21)
En vista de que la Oficina del Contralor realizó estos serios señalamientos acerca del arrendamiento de los edifi-cios de la OAT, del Tribunal de Apelaciones, la Sala de Relaciones de Familia y Asuntos de Menores y conside- *842 rando que este es el mismo tipo de contratación que se pretende realizar en el Centro Judicial de Aibonito, la OAT debió cancelar la subasta. El curso de acción responsable hubiese sido detener la contratación para estudiar la razón de estos costos excesivamente elevados. Es decir, la admi-nistración de la Rama Judicial debió solicitar un estudio de los precios de la renta en el mercado para edificios compa-rables a la fecha de la negociación para asegurarse de la razonabilidad del canon de arrendamiento.
Por otro lado, el Comité Evaluador y la mayoría de este Tribunal reconocen que la propuesta de STZ fue desfavore-cida en el criterio del costo de arrendamiento. No obstante, validan la otorgación de esta propuesta a STZ fundamen-tándose en su alegada superioridad en otros criterios de evaluación. Sin embargo, el análisis de este Tribunal no debe girar en torno a si la propuesta es superior, porque provee diferentes edificios y estacionamiento techado, sino que debió girar en torno a si es sana administración pú-blica la erogación de fondos para pagar un arrendamiento en exceso de una cantidad razonable del valor en el mercado. Después de todo, ¿no es el propósito principal de las subastas el adquirir bienes y servicios al menor costo posible? Las expresiones de la mayoría de este Tribunal otorgan gran flexibilidad en este aspecto —con lo cual, prima facie, estoy de acuerdo pues no existe una regla inflexible al respecto. Empero, ¿cuál es el límite? Me temo que en esta ocasión la mayoría confunde este límite bajo la premisa de “discreción administrativa”. Esa discreción quedó maculada, toda vez que no puedo confiar en un Co-mité Evaluador el cual —sin negar las cualificaciones per-sonales de cada integrante— incluyó únicamente a dos (2) ingenieros quienes, en esencia, se hicieron cargo de la eva-luación de unas propuestas para la otorgación de un con-trato que requiere el dispendio de fondos públicos en can-tidades astronómicas.
*843 ¿A la luz de qué teoría pretenden hacer caso omiso a los señalamientos de la Oficina del Contralor? ¿Acaso la Rama Judicial y sus administradores tienen licencia para des-atender los hallazgos realizados por la Oficina del Contra-lor? Entonces, ¿qué moral nos da legitimación para impo-ner nuestros criterios de sana administración cuando en nuestra casa reina todo lo contrario? ¿Ese es el ejemplo que queremos dar? Todas estas preguntas están latentes en mi conciencia y son las que me mueven a escribir en esta ocasión.
La administración de la Rama Judicial debe comenzar evaluando si verdaderamente, en virtud de la sana admi-nistración, es conveniente otorgar el “Contrato de Diseño, Construcción, Financiamiento y Arrendamiento” y cuánto podría ser la renta razonable en el mercado que ubica en Aibonito. Pero nada de esto ha ocurrido. El dinero que se está pagando en exceso mensualmente podría ser utilizado para resolver otras necesidades de la Rama Judicial. En lugar de ello, la OAT ha decidido pagar quinientos setenta y seis dólares ($576) por cada estacionamiento de la OAT y el Tribunal de Apelaciones; sin olvidarnos de los más de doscientos millones de dólares ($200,000,000) que pagará la Rama Judicial en exceso del canon de una renta razonable. (22)
Por último, estoy consciente de que se trata de edificios que albergan a los tribunales de este país, pero han sido desarrollados sin una planificación y la fiducia requerida para proteger los fondos de la Rama Judicial.
Por los fundamentos esbozados, no otorgaría el contrato a ninguno de los proponentes en el caso de autos. En lugar de ello, cancelaría la Subasta del caso de autos, de modo *844 que la OAT regrese a la fase de planificación y ausculte, en primer lugar, si es verdaderamente conveniente otorgar un “Contrato de Diseño, Construcción, Financiamiento y Arrendamiento”; en segundo lugar, como corolario de la sana administración, debe obtener varias opiniones profe-sionales fundamentadas con relación a cuál sería el costo razonable del desarrollo del nuevo Centro Judicial de Aibonito. No será hasta entonces cuando la OAT estará en posición de evaluar propuestas para el desarrollo de este proyecto, según enmarcado en el principio de sana admi-nistración y de adquisición económica de bienes y servicios para el gobierno.
Hoy me siento terriblemente preocupada, pues esta Curia hace caso omiso a los graves señalamientos de la Ofi-cina del Contralor con relación a subastas anteriores de la Rama Judicial. A su vez, no puedo avalar los distintos ac-tos arbitrarios de la OAT en la contratación sobre el nuevo Centro Judicial de Aibonito. Pero más preocupante es que mis compañeros jueces hayan decidido no usar sus tinteros para detener las acciones claramente arbitrarias de la OAT. Desde este Tribunal se han aplicado los más altos estándares de sana administración a las otras ramas de nuestro gobierno. Sin embargo, hoy ha llegado el día de hacer lo propio con la Rama Judicial, a la que con tanto esmero servimos. El no hacerlo de la misma forma, comu-nica el mensaje equivocado: ante alegaciones y actos arbi-trarios de la Rama Ejecutiva, por ejemplo, este Tribunal es muy estricto y poco deferente, mientras que con las accio-nes arbitrarias del brazo administrativo de la Rama Judicial, somos en extremo deferentes.
No puedo prestar mi voto para eso. Desde que llegué a la Rama Judicial he sostenido que los jueces estamos so-metidos a iguales reglas y escrutinio público al cual están constantemente sometidos los servidores de las ramas políticas. Sin embargo, con la sentencia que antecede, pa-recería ser que quienes realizan contratos con la Rama Ju *845 dicial, deben estar dispuestos a que este Tribunal no les provea un remedio efectivo frente a los actos arbitrarios de la OAT y la Rama Judicial.
V
Por los fundamentos expuestos, disiento respetuosa-mente de la sentencia emitida por el Tribunal. En conse-cuencia, revocaría la sentencia emitida por el Tribunal de Apelaciones y, en cambio, ordenaría la cancelación del pro-ceso de negociación del proyecto de construcción del nuevo Centro Judicial de Aibonito.

 Informe titulado “Análisis y Actualización de las Recomendaciones sobre las Sedes Municipales y la Configuración de las Regiones Judiciales”, abril de 2006.

 CC-2011-892, Apéndice de la OAT, pág. 649.

 El orden fue el siguiente: (1) STZ (ochenta y dos (82) puntos); (2) Roig (se-tenta y siete (77) puntos); (3) Maranello (setenta y seis (76) puntos); (4) Bird (setenta y cinco (75) puntos); (5) Aibonito Building (sesenta y siete (67) puntos); (6) BluPoint (sesenta y tres (63) puntos); (7) Judicial Center (sesenta y un (61) puntos); (8) ASOMA (cincuenta y cuatro (54) puntos); por último, (9) NORAVI (cincuenta y tres (53) puntos).

 En el trámite apelativo, Roig descendió al cuarto lugar, con setenta y tres (73) puntos, seguido de Aibonito Building, BluPoint, Judicial center, ASOMA y NORAVL Véase Sentencia, pág. 787.

 Actualmente el concepto de “compra negociada” se conoce comúnmente como Request for Proposal (RFP). Véase C. Tiefer, W.A. Shook, Government Contract Law in the Twenty-First Century, N.C., Carolina Academic Press, 2012, pág. 80. Específi-camente, estos tratadistas señalan lo siguiente: “[t]he method of requesting competitive proposal, principally known by the initial ‘RFP’ for ‘Request for Proposals’ and formerly known as ‘negotiated procurement’ ”. Id. No obstante, el Reglamento de Subastas Formales de Bienes y Servicios de la Rama Judicial denomina “compra negociada” al método de adquisición de bienes y servicios. Por otro lado, cuando hacemos referencia a un “RFP”, hablamos propiamente de la notificación en la que se incluye una solicitud o invitación para someter propuestas.

 Art. XXIV (A)(1), Reglamento de Subastas Formales de Bienes y Servicios de la Rama Judicial dispone:
“La compra negociada es un procedimiento de excepción para:
“1. La adquisición de bienes o servicios personales cuando éstos sean sofistica-dos o especializados o complejos.
“2. Los precios cotizados en una subasta formal resulten irrazonablemente altos.
“3. Los términos y las ofertas presentadas en una subasta formal resulten one-rosos para la Rama Judicial.
“4. En los casos antes indicados, el Jefe de Compras recomendará al Director Administrativo que se utilice este procedimiento para la adquisición de los bienes o servicios particulares.”

 Como regla general, estos factores pueden clasificarse en al menos una de cuatro categorías principales: (1) técnicos; (2) administrativos o gerenciales; (3) ex-periencia e historial de cumplimiento, y (4) precio o costo. S.W. Feldman, Government Contract Guidebook, 4ta ed., Ed. West, 2011, págs. 181-182.

 Aunque los factores y su importancia relativa deben plantearse claramente en el RFP, el método de rating no tiene que ser divulgado. Véase Feldman, op. cit, pág. 182.

 “Competition would not be served if offerors were not given any idea of the relative values of technical excellence and price”. Feldman, op. cit., pág. 181.

 Petición de certiorari de Maranello, Inc., pág. 6.

 Alegato en Oposición a recurso de certiorari Maranello, pág. 17.

 Íd.

 Sentencia, pág. 823.

 Si bien es cierto que ofreció alternativas al uso de este material, no es menos cierto que no proveyó detalles respecto a estas alternativas.

 http://www.ocpr.gov.pr/informes_en_PDF/pdf_2011_2012/da/DA-12-52.pdf. Los siguientes son los hallazgos señalados por la Oficina del Contralor en el Informe de Auditoría DA-12-52:
“1- Precontrato de arrendamiento de locales para el uso de la Rama Judicial otorgado a una corporación privada sin cumplir con el proceso de subasta según requerido por reglamento, y contrato relacionado con dicho arrendamiento otorgado sin proteger los intereses de la OAT.
2- Cánones estipulados en el contrato de arrendamiento de los edificios de la OAT y del TA que exceden las cantidades razonables que se pagan en el mercado.
3- Penalidades no impuestas a la Corporación por la entrega tardía del edificio para uso de la OAT.
4- Posibles conflictos de intereses de un funcionario de la Rama Judicial y un empleado de la firma de ingenieros a cargo de la Oficina de Inspección que repre-senta a la OAT en la construcción de los edificios.
5- Incumplimiento de disposiciones de la Ley Núm. 18 y del Reglamento Núm. 33 relacionadas con el registro de los contratos en la Oficina del Contralor de Puerto Rico”.

 http://www.ocpr.gov.pr/informes_en_PDF/pdf_2011_2012/da/DA-12-53.pdf. Los siguientes son los hallazgos señalados por la Oficina del Contralor en el Informe de Auditoría DA-12-53:
“1- Posibles situaciones irregulares en el arrendamiento de los edificios de las salas de Relaciones de Familia y de Asuntos de Menores de Bayamón, y de estacionamientos.
*839 2- Cánones estipulados en el contrato de arrendamiento del edificio de estacio-namientos de la SRFM que exceden cantidades razonables que se pagan en el mercado.
3- Deficiencias relacionadas con el Contrato de Arrendamiento en el Registro de la Propiedad y la inscripción de este.
4- Deficiencias relacionadas con la construcción y el arrendamiento de un edi-ficio para el Departamento de Justicia dentro de los terrenos cedidos en arrenda-miento a la OAT.
5- Posible conflicto de intereses del Ingeniero a cargo de la Oficina de Inspec-ción que representaba a la OAT en la construcción de los edificios de las SRFM y de estacionamientos.
6- Deficiencias relacionadas con las actas de las reuniones realizadas durante el proceso de construcción de los edificios de las SRFM y de estacionamientos”.

 Oficina del Contralor, Informe de Auditoría DA-12-52, 19 de marzo de 2012.

 Common Area Maintenance son los gastos que se distribuyen entre los in-quilinos para el mantenimiento del edificio. Esta cifra es por pie cuadrado de alquiler anual y típicamente se dividen en gastos por utilidades de uso común y gastos operacionales.

 Oficina del Contralor, Informe de Auditoría DA-12-52,19 de marzo de 2012, pág. 27. Según la Oficina del Contralor, el banco —que proveyó financiamiento para el proyecto— solicitó una tasación. En la tasación presentada al banco se expresó que el arrendamiento negociado entre la OAT y el desarrollador era mayor al valor de alquiler de los espacios de oficina en el área metropolitana. íd., pág. 28.
Asimismo, la Contralora reveló en su informe que la Oficina de Auditoría Fiscal de la OAT recomendó no suscribir el contrato con el desarrollador. íd., págs. 16-17, 28. En cambio, favoreció una propuesta sometida por la Autoridad de Edificios Públicos. íd., pág. 28.

 Oficina del Contralor, Informe de Auditoría DA-12-53, 19 de marzo de 2012, págs. 30-33.

 íd., pág. 32. Esta auditoría también revela que una Jueza Superior, asig-nada a la Sala de Relaciones de Familia de Bayamón, participó en la toma de deci-siones que condujeron al otorgamiento de los contratos concernidos. Id., pág. 17. A su vez, la Jueza Superior, Hon. Raquel Irlanda Blassini, era representante, codueña y hermana del presidente de la corporación con la que la OAT, entonces representada por la Hon. Mercedes Marrero de Bauermeister, otorgó un precontrato de arrendamiento. Aunque el contrato de arrendamiento fue posteriormente cedido a otra corporación, el Informe del Contralor consigna que estos actos evidencian que los intereses de la OAT no estuvieron protegidos. Id-, págs. 27-28.

 No deja de asombrarme el hecho de que la Rama Judicial paga quinientos setenta y seis dólares ($576) mensuales por estos estacionamientos mientras que en el Viejo San Juan —donde el espacio de estacionamiento es escaso— puede alqui-larse por aproximadamente doscientos veinticinco dólares ($225).